## STATE, Respondent, v. LAMB, Appellant.

### (164 N. W. 69.)

(File No. 4132.   Opinion filed August 30, 1917.)

1.  Criminal Law—Appeals—Larceny of Shipped Cows—Defendant's Knowledge of Ownership, Exclusion of Evidence, Non-conflicting Evidence—Harmless Error.

    In a prosecution for larceny of cows shipped by defendant and another, trial court did not err in excluding testimony of defendant concerning a conversation between him and a member of a commission firm at destination concerning defendant's knowledge or want of knowledge of ownership of the cows in question; there being no conflict in the evidence as to what occurred at that time, and defendant could not have been prejudiced by exclusion of the proffered evidence; nor is defendant's contention tenable, that such ruling was prejudicial because the state was compelled to rely wholly on recent possession of the stolen property as a circumstance from which the jury might infer defendant's guilt, and that the excluded evidence was competent as explanatory of defendant's alleged or apparent possession and would tend to show he was in conscious possession thereof; since other evidence constituted ample proof of the corpus delicti.

2.  Larceny—Recent Possession of Shipped Stolen Property—Clear Evidence of Defendant's Shipment—Application of Rule.

    In a prosecution for larceny of cattle shipped by defendant, and another, held, that the rule as to the effect of recent possession of stolen property as a circumstance from which jury might infer defendant's guilt, was applicable to the facts, where it was undisputed that defendant himself was at the stockyards and near the chute when cattle were loaded into his cars, and the stolen cattle were found with his cattle in the stockyards at destination.

3.  Larceny—Participation in Wrongful Taking of Shipped Cows—Question for Jury.

    In a prosecution for larceny of cows shipped with other cattle in defendant's car, the question whether defendant participated with his agent in a wrongful taking of the cows when loaded with other cattle in his car, held to be one for the jury under the evidence.

4.  Larceny of Shipped Cattle—Recent Possession, Proper Instructions Concerning, Erroneous Verdict re Defendant's Guilt and Knowledge—Witness' Credibility—Question for Jury.

    Where, in a prosecution for larceny of shipped cows, the court's instruction concerning recent possession of the alleged stolen property, and concerning the evidence and its effect upon his guilt or innocence, is concededly correct, held, that

the contention that the verdict is against the instruction be-
cause there is no proof that the cattle were stolen by de-
fendant, and that the undisputed evidence is that he did not
know they were in his possession until after the car was
unloaded, etc., is untenable, since the question of defendant's
guilty knowledge and participation in the action depended
upon testimony of witnesses whose credibility was to be
weighed by the jury.

5.   Same—Guilt—Sufficiency of Evidence.

In a prosecution for larceny of shipped cows evidence held
sufficient to sustain verdict of conviction.

Whiting, J., not sitting.

Appeal from Circuit Court, Tripp County.   Hon. WILLIAM
WILLIAMSON, Judge.

The defendant Mike Lamb, was convicted of larceny of ship-
ped cows, and from the judgment and from an order denying
motion for a new trial, he appeals.   Affirmed.

*E. O. Patterson, A. J. Wilcox,* and *Gaffy & Stephens, for*
Appellant.

*Clarence C. Caldwell,* Attorney General, *Byron S. Payne,*
Assistant Attorney General, and *Roscoe Knodell,* State's Attorney,
for the State.

(1) To point one of the opinion, Appellant cited:   Nelson
v. People, 44 Pac. 594; Mitchell et al. v. Territory, 54 Pac. 782;
Mach v. State of Wisconsin, 4 N. W. 449; State v. Beard, 147
N. W. 69.

Respondent cited:   Roach v. Ry. Co. (Minn.) 158 N. W.
233; Wharton Crim. Evi., Sec. 691; Underhill Crim. Evi., Sec.
97; State v. Waters, 139 Mo. 539, 41 S. W. 221; Foster v. State,
4 Tex. App. 246.

(2) To point two of the opinion, Appellant cited:   Mitchell
et al. v. Territory, 54 Pac. 782; Hamilton v. State, 36 Ind. 280;
Van Straaten v. People, 56 Pac. 905; State v. Humason, 32 Pac.
110, 113; Mack v. State, 4 N. W. 449; State v. Strodemeir, 82
Pac. 914; State v. Potello, 119 Pac. 1022.

(3) To point three of the opinion, Appellant cited:   Dobson
v. State, 64 N. W. 956; Robb v. State, 53 N. W. 134.

SMITH, J.   Appellant and one Collins were charged jointly
with the larceny of two cows, the property of one Hochholter.
Appellant was tried separately.   This appeal is from a verdict and
judgment of conviction and an order overruling a motion for a

new trial.   There are some 20-odd assignments of error in rulings
upon evidence, and an assignment of insufficiency of evidence to
sustain a conviction.   There is but little conflict in the evidence.
A statement of the evidence and facts disclosed by the record is
necessary to an understanding of the effect of the rulings.

Appellant testified that Collins was employed by him about
March 1913, 1916, to buy a couple of carloads of stock to be
shipped to Omaha; that Collins purchased 35 or 40 head of cattle,
part of which were taken to a ranch and part brought to Winner
for shipment.   On Friday or Saturday prior to March 13th,
Collins and appellant were at the farm of one Drahos, from
whom they bought a thin red muley cow, weighing about 700
pounds, with a white spot on her forehead; paid Drahos $5 for
her.   This cow had trouble walking, and slid her hind legs a
little bit when she stepped.   Appellant saw the cow put into a
wagon to be hauled to Winner, and saw her at the stockyards
after she was unloaded.

Clyde Sargent, a witness for defendant, testified that he saw
the two Calhoun boys unload the cow right at the west end of
the scales by the yard.   In the meantime Collins, assisted by one
Calhoun, drove in 9 head of the cattle bought for shipment, and
put them in the stockyard at Winner.   This was late in the after-
noon.   About 11 o'clock that night appellant with Dougherty and
Sargent went down to the yards and saw the stock, found it
resting quietly, went up to the car a few minutes, and then all
went up town for supper.   While eating supper they talked about
crating the "canner cow."   They left the cafe, and went back to
the stockyards, and on the way down, four of them picked up
pieces of grain doors and carried them to the car in which they
were about to load the stock.

Collins as a witness for defendant testified that he went out
and located this "canner cow" by the stockyards fence, and tried
to drive her up the chute into the car and shut the car door;
called the boys to help, but could not hold her, and she got away;
that he and Dougherty then went out and got this "canner cow"
and put her in the car again; that they found two cows right
alongside the yard where defendant's cattle were; that the fasten-
ing on the top of the gate was gone, and the gate sagged; that
he and Dougherty drove these 2 cows into the stockyards; that

when they got to the loading pen, one of the Calhoun boys was with them; that they helped the "canner cow" up the chute into the car and proceeded to nail her there; that they crowded her into a corner and got one of the boards nailed, when the cow side-stepped a little and the nails would not hold her; that the trainmen yelled at them to get the cattle loaded, and they threw the boards out and went out and got the rest of the stock and loaded it into the car, which was immediately moved out to the main track. Appellant himself testified that he was present when the cattle were loaded, but was not doing much of anything, only keeping out of the mud on the west side of the yards; that he had the other men there to load the stock for him; that Collins was looking after it principally.

Clyde Sargent, a witness for the defendant, who assisted in loading the stock, testified that he put the hay in the car before the stock was loaded; that he saw Collins after two cows which he drove into the car right afterwards; that the witness got into the car and tried to drive the red cow up in the end of the car; that he noticed another cow in the west end of the car; that they did not get the red cow crated, and threw out the boards; that he then walked down the track where the other cattle and hogs were, and saw defendant standing at the west side of the chute by the car; saw Collins and the others open the gate and drive the stock into the car. After all the stock had been loaded in the car, Collins and appellant went immediately to the depot to have the stock billed out. The shipping bill, which called for ten head of stock, was made out in appellant's name, but was signed by Collins.

E. J. Wills and Vern Wills, known as Wills Bros., shipped out cattle in another car the same night, and as a part of the same trainload of stock. At the same time, one McGrette was shipping cattle which were included as a part of Wills Bros.' shipment. Appellant's shipment was consigned to Fish, Cunningham & Co., a commission firm in Omaha. Wills Bros.' shipment, including McGrette's cattle, was consigned to the Great Western Commission Company in Omaha.

After the train started all of the shippers, and others, were in the caboose attached to the stock train. During the night a card game started, in which Collins and McGrette took part; it was

proposed that Collins and McGrette play for the poorest animal in their respective carloads. Appellant himself testified that he was on one of the seats half asleep when Collins turned and said to him, "I am going to play that 'canner cow,' Mike, is that all right?" and appellant answered, "Yes." Appellant referred to the "canner cow" purchased from Drahós. They played and Collins lost. Collins joked McGrette about the cow he had won, how thin she was; that she was a "canner cow," and had only cost $5. This appears to have created some amusement, and at some stopping place they all, including appellant, got out of the caboose and went over to appellant's car to see the "canner cow"; could not find her on that side of the car, started to go around to the other side, when the train pulled out, and they all went back to the caboose. The train arrived at Omaha some time early in the morning of March 15th. Appellant testified that after they reached Omaha he saw Wills and talked with him about delivering the "canner cow" to his commission firm, the Great Western Commission Company, and gave Wills an order on Fish, Cunningham & Co. to deliver the cow to Wills; that he then went to the office of the Live Stock Exchange Building, washed, and went to the office of the Great Western Commission Company, and asked them to go down to the chutes and get the "canner cow" from Fish, Cunningham & Co. for Mr. Wills, as he was shipping to their firm.

Vern Wills testified that after the game of cards on the train, he asked appellant if Collins had many cows, and appellant answered: "No; he only had 1." Then he asked: "Do you people have a carload of cattle?" and appellant answered: "No; Collins only had 1 and he had 10." Wills also testified: That he saw appellant in the office of the Great Western Commission Company and heard him say that Mr. Wills had a cow coming to him from Fish-Cunningham Company, and he would see that it was transferred, or something to that effect. That they talked about the cow Collins lost. That afterwards they walked up the yards to see the cattle. That appellant was there. That they wanted to cut out the cow McGrette had won, and wanted to know which one it was. That there was a spotted cow there, and they asked appellant if that was the one; that appellant said that was his cow, and not Collins'. That later, the witness saw some

cows that were held over out of the shipment, three of them, one spotted cow, one red, and a brindle. Defendant was there with the detective. That at that time appellant stated that these three cattle did not belong to him, and he was not sure whom they did belong to, or something to that effect.

One Allen, a witness for the state, testified: That he lived at Omaha, was a police detective; first saw appellant on March 15th at the Union Stockyards; had a conversation with him about a shipment of cattle from Winner. Appellant stated he had a car of hogs and cattle in the yards. That he had 11 cattle, and that he said: "Well, I have got 10 of my own, and 1 belongs to a man by the name of Collins." This was before anything was said about the cattle being stolen, and before any arrest was made. Said he had shipped to Fish, Cunningham & Co. That witness then took defendant to the station for examination. Witness then told appellant there was some trouble about the shipment, and wanted him to go to the station for investigation. This was between 9 and 11 o'clock in the morning.

Michael Gillian, a witness for the state, testified that he was a resident of Omaha and a police detective. His testimony is substantially the same as that of Detective Allen, except that appellant first told him he had 11 cattle, and afterwards, at the station, said that 10 of the cattle were his and 1 "he didn't know know nothing about"; that appellant stated the number of cattle in his shipment before he was informed that they were officers.

George Hochholter, a witness for the state, testified that he lived in Winner, and on March 13, 1916, and prior thereto owned 4 cows; that he missed 2 of them on the morning of March 14th, one of them red with a little white on her and a strip in the forehead, and the other a brindle cow; that he searched for the cows, but could not find them; that he saw them last about 11 o'clock on the night of March 13th right by the barn at his home, and next saw them in Omaha, about March 15th, where he found them with appellant's cattle, in the stockyards; that he did not know of or consent to any one taking the cows; that his yard fence would not hold a cow if she wanted to get out; that he missed the two cows about 6 o'clock in the morning; that the other two cows were then in his yard.

The record conclusively shows that the cow which appellant bought from Drahos called the "canner cow" was never loaded into the car at all, but was found the next morning after the shipment running at large on the streets in the town of Winner. It is impracticable to review separately the 20 assignments of error in the exclusion of evidence. The following are examples:

"Q. Mr. Lamb, when you arrived at Omaha and went to the office of the Great Western Commission Co., what did you go there for?" "Q. Did you at that time, Mr. Lamb, intend to turn over this 'canner cow' to Wills Bros?" "Q. And why didn't you tern over that cow?" "Q. Did you at that time tell him (Wills) why you would not deliver him that cow."

Similar questions were asked Collins, to which objections were likewise sustained.

Cunningham, of Fish, Cunningham & Co., a witness for the state, was asked:

"Q. What was said to you by Mr. Lamb about a 'canner cow' that was to be delivered by him to the Great Western Company of Omaha, Neb., on the 15th day of March, 1916. (Objection sustained.)"

Appellant then made an offer of proof by the witness on the stand, as follows:

"At this time the defendant offers to prove, etc. (Objection sustained.)"

[1] Appellant was permitted to testify as to what was said and done between Cunningham and himself at the office of Fish, Cunningham & Co. on the morning of June 15th, and we are somewhat at a loss to understand upon what theory the testimony of Cunningham as to this same conversation was excluded by the trial court. But as there was absolutely no conflict in the evidence as to what occurred at that time, we are unable to perceive in what way appellant could have been prejudiced by the exclusion of this proffered evidence. Appellant's contention that these rulings were prejudicial appears to be founded upon the assumption that the state was compelled to rely wholly upon recent possession of the stolen property as a circumstance from which the jury might draw an inference of appellant's guilt, and that the evidence excluded was competent as explanatory of appellant's alleged or apparent possession, and would tend to show that

appellant was not in conscious possession of the stolen property. The evidence of Hochholter was ample proof of the corpus delicti, and it is undisputed that the stolen cows were loaded into appellant's car at Winner, and were found with his cattle at the stockyards in Omaha.

[2, 3] The rule as to the effect of recent possession of stolen property was certainly applicable to the facts, and was correctly stated by the trial court. But appellant is wholly in error in assuming that there was no other evidence upon which the jury might predicate appellant's guilt. It is undisputed that appellant himself was at the stockyards at Winner, and near the chute when cattle were loaded into the car, and under the evidence, it was clearly a question for the jury whether at that time appellant participated with his agent Collins in a wrongful taking of these cows. The question of appellant's guilt was submitted to the jury, not upon the fact of recent possession of stolen property alone, but upon the whole evidence before them. The trial court said to the jury:

"If from the evidence you should be convinced beyond a reasonable doubt that the property in question was stolen, and that the defendant soon after its theft was in possession of it, that is a circumstance to be taken into consideration by you in making up your verdict, and unless such possession is satisfactorily explained by the defendant or by the facts and circumstances brought out upon the trial would be sufficient upon which to convict the defendant, provided upon the whole case you are satisfied beyond a reasonable doubt of his guilt. The defendant does not deny that the two Hochholter cows were among the cattle shipped to Omaha, but does deny that he knew they were in his car. He testifies in substance that he learned for the first time after arriving at Omaha that the two Hochholter cows were in the shipment, and says that he at no time had any intention of stealing them. This explanation, if believed by you, is a sufficient explanation of the defendant's possession of the cows. In other words, if the defendant came into possession of them innocently, believing he had his own cattle, and did not afterward form the ideal of stealing them, then you should acquit him."

[4] Appellant concedes that this instruction is not erroneous, but argues from it that the verdict is against the instruction, for

the reason that there is no proof that the cattle were stolen by defendant; that the undisputed evidence is that he did not know they were in his possession until after the car was unloaded, and that he thereupon disclaimed all interest in or right of possession thereto.  But the question of appellant's guilty knowledge and participation in the whole transaction depended upon the testimony of witnesses whose credibility was to be weighed by the jury, and it can hardly be doubted that the credibility of appellant's own testimony was seriously impaired by his admission upon the witness stand that he had been theretofore convicted of aiding and abetting larceny in the state of Nebraska.

[5] After a careful examination of every assignment of error and of the entire record, we are satisfied that the evidence is amply sufficient to sustain a conviction, and that the rulings complained of are not shown to have been prejudicial to appellant's substantial legal rights.  The order and judgment of the trial court are therefor affirmed.

WHITING, J., not sitting.